IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JERRYAL J. CULLER, SR.,

          Petitioner,          No.  CIV S-10-0912 LKK GGH P

    vs.

JOHN HAVILAND, Warden,

          Respondent.          FINDINGS AND RECOMMENDATIONS

_____/

Introduction

          Petitioner, a state prisoner proceeding pro se, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner, who was sentenced in 1992 in Contra Costa County Superior Court to a term of life with the possibility of parole for aggravated mayhem with use of a deadly weapon (flammable liquid), intentionally causing great bodily injury, challenges the 2009 decision by the California Board of Parole Hearings (BPH) finding him unsuitable for parole.  Petition (docket # 1), p. 2  & Exhibit D to Memorandum of Points and Authorities (docket # 2-1), 2009 Parole Hearing Transcript (hereafter, PHT), p. 4[1] ; Answer, 2009 Parole Hearing Transcript (hereafter, PHT) (docket # 16-2), p. 8, (docket # 16-3), p. 2.

_____

[1] The court's electronic system's pagination is referenced for all documents cited.

1   Petitioner challenges, as arbitrary and capricious, the denial of parole on five grounds: 1) BPH

2   has denied petitioner due process and equal protection for the sixth time for failing to establish

3   the criteria for aggravated mayhem, Cal. Pen. Code § 1168/203, pursuant to their duty under Cal.

4   Penal Code §§ 3041(A), 3041.5 [6]; 2) "BPH Commissioners Anderson and Goughnour

5   knowingly, willfully, and maliciously relied on" information that was biased, including racially

6   biased, from a BPH "hired gun" psychiatric evaluator unsupported by any prior psychiatric

7   report; 3) BPH commissioners continued "to violate ADA Northern District Court Ordered

8   Stipulation, Due Process, and Equal Protection by using petitioner's medical condition as an

9   element to deny parole plans"; 4) in 1998, 2001, 2002, 2005, 2007 and 2009, BPH

10  commissioners repeatedly used petitioner's commitment offense as a basis for parole denial and

11  now, without supporting judicial authority, have reclassified non-murder petitioner's offense as a

12  murder in violation of his due process and equal protection rights; 5) "BPH has violated the Ex

13  Post Facto." Petition, pp. 6-10.

14          By order, filed on February 2, 2011, the parties were directed to provide

15  simultaneous supplemental briefing, why the instant petition should not be dismissed in light of

16  the recent United States Supreme Court decision that found that the Ninth Circuit erred in

17  commanding a federal review of the state's application of state law in applying the "some

18  evidence" standard in the parole eligibility habeas context.  Swarthout v. Cooke, ___ U.S. ___,

19  131 S. Ct. 859, 861 (2011).[2]  The parties submitted the additional briefing timely.

20  AEDPA

21          The statutory limitations of federal courts' power to issue habeas corpus relief for

22  persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

23  Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

24          An application for a writ of habeas corpus on behalf of a person in

25  _____

26  [2] The earlier citation in the prior order was to Swarthout v. Cooke, [___] U.S. ___, ___ S.
    Ct. ___, 2011 WL 197627 *2 (Jan. 24, 2011)

custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S.Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, supra, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination.  A petitioner must show clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, supra, 131 S.Ct. at 786-787.  "Clearly

1  established" law is law that has been "squarely addressed" by the United States Supreme Court.

2  Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of

3  settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

4  Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state

5  sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

6  prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

7  established law when spectators' conduct is the alleged cause of bias injection).  The established

8  Supreme Court authority reviewed must be a pronouncement on constitutional principles, or

9  other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

10  federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

11        The state courts need not have cited to federal authority, or even have indicated

12  awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S.Ct.

13  at 365.  Where the state courts have not addressed the constitutional issue in dispute in any

14  reasoned opinion, the federal court will independently review the record in adjudication of that

15  issue.  "Independent review of the record is not de novo review of the constitutional issue, but

16  rather, the only method by which we can determine whether a silent state court decision is

17  objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

18        Finally, if the state courts have not adjudicated the merits of the federal issue, no

19  AEDPA deference is given; the issue is reviewed de novo under general principles of federal law.

20  James v. Ryan, __ F.3d __, 2012 WL 639292 *18-19 (9th Cir. 2012).

21  Argument & Analysis

22        Because petitioner himself, in his supplemental briefing (pp. 5-6) , has conceded

23  that Swarthout v. Cooke, 131 S. Ct. 859, forecloses his claims 2, 3 and 4 (with a caveat as to

24  claim 3, addressed below),[3] the court will address those claims first and then proceed to

25  _____

26        [3] Petitioner frames the concession a little oddly: "Petitioner's second, third and fourth claims are all procedural issues that are covered under Swarthout v. Cooke, [] _ U.S. __, __ S.

1   consideration of claims 1 and 5.

2         "Some Evidence" Claims-Claims 2, 3, and 4

3        *Claim 2*

4       As support for petitioner's claim that the BPH panel relied on "bias and racially

5   bias[ed] information from a BPH []'hired gun' evaluator ... not supported by any previous

6   psychiatric report" to deny him parole, petitioner contends that in "[t]he two major categories,

7   Risk for Violence and Overall Risk assessed by Forensic Evaluator Michael L. Venard, Ph.D.,"

8   the assessment was contradicted by all prior psychologists and his conclusions included

9   misinformation and inaccurate conjecture as to his juvenile history made up to increase the risk

10  of violence petitioner posed.  Petition, p. 7.  Petitioner also faults Dr. Venard's conclusion re:

11  "Antisocial / Psychotic" as unsupported by any of the prior psychologists, specifically Drs. Les

12  Carr, H. Ishida, and Tone F. Blanchard, all Ph.D.'s.  Id.  In his supporting memorandum,

13  petitioner groups the above into a group of "three major categories": "risk for violence, overall

14  risk assessment, and antisocial/psychotic."  Memorandum of Points and Authorities [in Support

15  of Petition], hereafter, identified as docket # 2, for ease of reference, p. 6.  Petitioner asserts that

16  Dr. Venard was incorrect in stating that petitioner had problems in high school, but petitioner

17  avers he was never suspended for fighting in junior high and never told Dr. Venard that he had

18  been.  Docket # 2, pp. 8-9.  Petitioner also contends that his efforts to "reconstruct the

19  ambiguousness of the crime" are genuine and do not show a lack of insight.  Id., at 9.

20      In the BPH transcript, Dr. Venard's assessment included discussion of petitioner's

21  negative disciplinary history, his lack of recent participation in AA or NA, the results of a battery

22  of tests which included a score that placed petitioner "in the high range of clinical construct of

23  psychopathy" and a finding that petitioner was "in the moderate risk category for violent

24  \\\\\\

25

26  Ct. 2010 decision."  Petitioner's Supplemental Briefing (PSB) (docket # 21), p. 5.

recidivism." Docket # 2-1, pp. 60- 61; Answer, 2009 BPH transcript (docket # 16-2), pp. 64-65.[4]

Petitioner points for comparison to a psychological evaluation by a clinical psychologist named Dr. Carr for a 1998 BPH hearing, which noted his extensive arrest history and long-term drug and alcohol dependence but noted "no evidence of a psychotic or organic impairment," nor evidence of "an antisocial personality structure of a criminal type," his "Christian commitment ... as a therapeutic support system for him," and his "functioning on a high average level of intelligence" and his "industrious" work orientation. Docket # 2-2, pp. 29-30. An excerpt of a clinical assessment of a Dr. Isheda, finds petitioner to be at a "below average risk for violence when compared to the general inmate population," but also notes "[v]iolence potential is unpredicatable in that causative factors are multidetermined." Id., at 32-33. Dr. Blanchard, in an excerpt, finds, inter alia, petitioner's risk of violent recidivism to be average, that his "greatest risk factor"... "is his history of alcohol dependence." Id., at 34. Dr. Blanchard also found petitioner statements about the crime to sound "rehearsed and meaningless" and that he did "not appear to have fully accepted the gravity of his crime." Id. Dr. Blanchard, nevertheless, found petitioner to be "competent and responsible for his own behavior" and to know right from wrong. Id. At the hearing, petitioner objected to Dr. Venard's report as biased/racially biased and when asked to demonstrate how the psychologist showed racial bias, petitioner stated:

> Okay. He assessed me because I fathered some children at an early age, that that shows a propensity for violence, or then he uses words like cultural expectations. That's just buzz words, that - -

Docket # 2-1, p. 62; Answer, 2009 BPH transcript (docket # 16-2), pp. 66.[5]

When petitioner was questioned as to how referencing his having children and multiple wives showed a racial bias, petitioner stated:

---

[4] A copy of Dr. Venard's "Comprehensive Risk Assessment" is located at docket # 16-4, pp. 55-66.

[5] References from this point on to the BPH transcript, for the sake of simplicity, will just refer to pages within docket # 16-2 (filed with the Answer).

> No, that's a biasness, as far as I'm concerned, as to saying that
> because I have children at an early age or dropped out of school to
> take care of the children, that that shows a propensity for violence.
> That was my only complaint on that that was racial.

Docket # 16-2, pp. 67-68.

Deputy Commissioner Goughnour, having engaged in a discussion to try to elicit

a specific basis for petitioner's claims of bias, at that point stated that he was not "getting

anywhere on this" and the hearing moved on. Id., at 68.

Because the state Court of Appeals and California Supreme Court's denial was a

summary one,[6] the court must look through to the last reasoned decision, in this instance, the

denial by the Contra Costa County Superior Court.  When reviewing a state court's summary

denial of a claim, the court "looks through" the summary disposition to the last reasoned

decision.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000), citing Ylst v.

Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590 (1991).

> Petitioner contends that the Board "willfully and maliciously relied
> on both bias and racially bias information [...] from ...an
> [e]valuator that was not supported by any previous report ...".  The
> risk assessment report authored by Dr. Venard on March 3, 2009
> was unfavorable, as it assessed petitioner as a moderate-high risk
> for future violence. Ex. D, p. 11-12 (Risk Assessment).
>
> Petitioner objected at the hearing on the grounds the forensic
> psychologist showed racial bias. [] Petitioner complained that there
> were racial undertones related to the clinician's observation that he
> had had numerous children with a variety of women and that he
> had dropped out of school.  Ex. D, p, 3, 8 (Risk Assessment); Ex.
> D, p. 62-63 (Board Hearing).  The Clinician concluded that
> petitioner's "antisocial behaviors [were] the result of enduring,
> inflexible and pervasive pattern of inner experience that deviate[d]
> markedly from cultural expectations." Ex. D, p. 8 (Risk
> Assessment).
>
> When pressed by the Board, however, petitioner was unable to
> articulate any specife aspect of the report that showed racial
> discrimination. Ex. D, p. 60-62 (Board Hearing).  At this time
> petitioner has failed to articulate the basis for his claim of racial

---

[6]  Answer, Ex. 6 (docket # 29-9).

> discrimination.  There was nothing in the record before the Board
> or in the risk assessment that supports a claim that the Board relied
> on racially-biased information.

Contra Costa County Superior Court ruling in docket # 2 at pp. 35-36; Answer, docket # 16-3, pp. 14-15.

The court's review of the BPH transcript reveals that this is an accurate summary of what transpired at the hearing.  Petitioner is correct to concede that this claim is among those that come under a challenge based on the "some evidence" standard.  As noted, the parties timely filed supplemental briefing, but as was set forth in the earlier order (docket # 18), there appears to be no federal due process requirement for a "some evidence" review.  Quoting, inter alia, Estelle v. McGuire, 502 U.S. 62, 67 (1991), the Supreme Court recently re-affirmed that "'federal habeas corpus relief does not lie for errors of state law.'"  Swarthout v. Cooke, ___ U.S. ___, 131 S. Ct. at 861.  Id.  While the high court found that the Ninth Circuit's holding that California law does create a liberty interest in parole was "a reasonable application of our cases" (while explicitly not reviewing that holding),[7] the Supreme Court stated:

> When, however, a State creates a liberty interest, the Due Process
> Clause requires fair procedures for its vindication-and federal
> courts will review the application of those constitutionally required
> procedures. In the context of parole, we have held that the
> procedures required are minimal.[8]

Swarthout v. Cooke, at 862.

---

[7] While not specifically overruling Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (en banc), the Supreme Court instead referenced Pearson v. Muntz, 606 F.3d 606 (9th Cir. 2010), which further explained Hayward.  Thus, the Supreme Court's decision in Swarthout, essentially overruled the general premise of Hayward.  When circuit authority is overruled by the Supreme Court, a district court is no longer bound by that authority, and need not wait until the authority is also expressly overruled.  See Miller v. Gammie, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc).  Furthermore, "circuit precedent, authoritative at the time it was issued, can be effectively overruled by subsequent Supreme Court decisions that 'are closely on point,' even though those decisions do not expressly overrule the prior circuit precedent."  Miller, 335 F.3d at 899 (quoting Galbraith v. County of Santa Clara, 307 F.3d 1119, 1123 (9th Cir. 2002)).  Therefore, this court is not bound by Hayward.

[8] References from this point on to the BPH transcript, for the sake of simplicity, will just refer to pages within docket # 16-2 (filed with the Answer).

Citing <u>Greenholtz</u>,[9] the Supreme Court noted it had found under another state's similar parole statute that a prisoner had "received adequate process" when "allowed an opportunity to be heard" and "provided a statement of the reasons why parole was denied." <u>Swarthout v. Cooke</u>, at 862.  Noting their holding therein that "[t]he Constitution [] does not require more," the justices in the instances before them, found the prisoners had "received at least this amount of process: They were allowed to speak at their parole hearings and to contest the evidence against them, were afforded access to their records in advance, and were notified as to the reasons why parole was denied." <u>Id</u>.

The Supreme Court was emphatic in asserting "[t]hat should have been the beginning and the end of the federal habeas courts' inquiry...." <u>Swarthout v. Cooke</u>, at 862.  "It will not do to pronounce California's 'some evidence' rule to be 'a component' of the liberty interest...." <u>Id</u>., at 863.  "No opinion of ours supports converting California's "some evidence" rule into a substantive federal requirement." <u>Id</u>., at 862.  Thus, federal courts are precluded from review of the state court's application of its "some evidence" standard.  The essence of Claim 2 of being prejudiced by a biased evaluation is essentially a claim that California's "some evidence" requirement was violated.

None of petitioner's claims of bias are predicated on any claim that the decision-makers themselves were biased[10] but rather that the assessment made by Dr. Venard was biased

---

[9] <u>Greenholtz v. Inmates of Neb. Penal and Correctional Complex</u>, 442 U.S. 1, 16 (1979).

[10] The Supreme Court has long recognized that "[a] fair trial in a fair tribunal is a basic requirement of due process." <u>In re Murchison</u>, 349 U.S. 133, 136, 75 S.Ct. 623 (1955); <u>Withrow v. Larkin</u>, 421 U.S. 35, 46, 95 S.Ct. 1456 (1975); <u>Bracy v. Gramley</u>, 520 U.S. 899, 904–05, 117 S.Ct. 1793 (1997); <u>see also</u>, <u>Stivers v. Pierce</u>, 71 F.3d 732, 741 (9th Cir. 1995) "Fairness requires the absence of actual bias ... .and even the probability of unfairness." <u>Murchison</u>, 349 U.S. at 136.  The Supreme Court counts a 'neutral and detached' hearing body as among the "minimum due process requirements" for a parole board.  <u>Morrissey v. Brewer</u>, 408 U.S. at  489, 92 S. Ct. 2593.  "Because parole board officials perform tasks that are functionally comparable to those performed by the judiciary, they owe the same duty: 'to render impartial decisions in cases and controversies that excite strong feelings because the litigant's liberty is at state.'" <u>O'Bremski v. Maass</u>, 915 F.2d 418, 422 (9th Cir. 1990).

and not supported by prior psychologists' reports and was thus arbitrary and capricious.  In essence, the claim is that California's "some evidence" standard was not met when the BPH panel was presented with an allegedly biased evaluation of his psychological condition. However, this argument goes no further than the ordinary credibility of a witness argument one might make at any proceeding.  As such it is totally encompassed by the Swarthout "some evidence" review preclusion.

The copy of the transcript of BPH initial parole consideration hearing at issue in this action demonstrates that petitioner was amply "allowed an opportunity to be heard" at the hearing and was undisputedly "provided a statement of the reasons why parole was denied." Answer, 2009 BPH transcript (docket # 16-2), pp. 6-91.  It is undisputed that petitioner had ample opportunity to be heard and that he was provided with a statement of reasons for his denial, which is all the due process the federal Constitution requires.  Claim 2 should be denied.

*Claim 3*

In support of petitioner's claim that the BPH commissioners continued "to violate ADA Northern District Court Ordered Stipulation, Due Process, and Equal Protection by using petitioner's medical condition (nephritis) as an element to deny parole plans," petitioner contends that BPH Commissioners Anderson and Goughnour denied petitioner parole in violation of a court-ordered stipulation.  Petition, p. 8.  The stipulation petitioner references is from a civil rights action in the Northern District of California, Culler v. Hepburn, et al., No. C-01-1484 WHA EDL PR (Docket # 2-2, pp. 167-254) dated April 29, 2004, wherein plaintiff (petitioner herein) stipulated to a dismissal with prejudice and defendant parole board members stipulated:

> that they will not consider plaintiff's disability, specifically his nephropathy as alleged in his complaint dated April 9, 2001, including any resulting inability to work, as a basis to deny his suitability for parole at any future parole hearings for which he may be eligible.[11]

---

[11] A copy of this stipulation and dismissal is also found submitted with the Answer at docket # 16-5, pp. 88-89.

The state court decision with respect to this claim stated:

Petitioner contends that the Board Commissioners violated the Northern District Court Ordered Stipulation by using petitioner's medical condition as an element to deny paroled plans.  On May 4, 2004 [] the U.S. District Court for the Northern District of California in Jerryal Culler Sr. v. B.P.T. Chairman Dave Hepburn, et al. [] issued a stipulation in which defendants Hepburn, Angle, McCormick, and Munoz, and Parole Board members stipulated that they would not consider petitioner's disability, specifically his nephropathy "as alleged dated April 9, 2001, including any resulting inability to work, as a basis to deny his suitability for parole at any future parole hearings...".  Ex. A.

In the present case, the Board initially determined that petitioner did not suffer from any disability that would have prevented him from participating in the hearing, in particular petitioner confirmed that he did not have any difficulty seeing, reading, and walking.  Nor did he suffer from any mental health issues.  Ex. D, p. 6 (Board Hearing).

Petitioner then informed the Board that he had nephritis, a kidney disease that caused his body to enlarge.  Ex. D, p. 7, 35-36 (Board Hearing).  In the Life Prisoner Evaluation Report dated May 2009 which the Board reviewed, petitioner expressed the view that he did not want his future employment plans to be an issue as he had a liver condition in which he might not be able to work.  Petitioner stated that he did not want that to be a reason not to grant parole.  Ex. C, p. 5.  To further punctuate this point, petitioner told the Board that he was at stage three kidney failure and could go into renal failure at any time so his ability to work "will be less than zero...unless they can stop the flare."  Ex. D, p. 64 (Board Hearing).  Petitioner explained that he would be disabled and would have to be on dialysis.  (Id.)

Despite his unfortunate disability, petitioner expressed the view to the Board that he did not believe he would have any problem getting employment.  He stated that "with all these jobs that are becoming available right now, I'll have a job in no time.  I've worked all my life...".  Ex. D, p. 35 (Board Hearing).  Petitioner stated that his union and social security would assist him in providing a source of funds to enable him to take care of himself.  Ex. D, p. 64-65 (Board Hearing).  The Board noted petitioner's confidence in the face of the current status of the California economy and petitioner responded that "I'll take whatever [job] is available."  Ex. D, p. 36 (Board Hearing).

Nowhere in the record does the Board use petitioner's medical condition as an element to deny parole.  In fact the record indicates that petitioner clearly articulated that he did not want his kidney disease to be used as grounds to deny him parole and reassured the

1
2
3

> Board that he was ready, willing and able to work.  Therefore there
> is nothing in the record to support petitioner's conclusory claim
> that the Board used petitioner's medical condition as an element to
> deny his parole."

4   Contra Costa County Superior Court ruling in Docket # 2 at pp. 36-37; Answer, docket # 16-3,

5   pp. 15-16.

6            There are a number of procedural and substantive threshold issues which must

7   first be discussed here.  Petitioner relies, in part, on a settlement in Northern District civil action

8   based on the Americans with Disabilities Act (ADA).  Respondent barely references this claim,

9   and the court's subject matter jurisdiction is in some doubt here.  Unless the district court in the

10  Northern District retained jurisdiction to enforce the settlement, even if based on federal claims,

11  district courts, have no jurisdiction to enforce the settlement.  Kokkonen v. Guardian Life Ins.

12  Co., 511 U.S. 378, 114 S.Ct. 1673 (1994).  Moreover, even assuming jurisdiction to take into

13  account the civil settlement, a habeas action outside the district of settlement is a doubtful place

14  to enforce such settlements.  Finally, even if reviewed on the merits of the disability allegations,

15  petitioner has not correctly characterized the record.

16           First, this is not an ADA "procedures" case, i.e., it does not deal with access

17  issues concerning the parole eligibility hearing itself.  Rather, petitioner's complaint is that the

18  ADA (or the settlement) was violated if the BPH adversely considered petitioner's disability

19  when determining the substance of the parole eligibility decision, specifically, if petitioner's

20  inability to work because of his disability was used to deny eligibility.  This is an issue, at least

21  initially, addressed by Thompson v. Davis, 295 F.3d 890 (9th Cir. 2002).  Thompson held that

22  the BPH (the BPT) could not *categorically* deny eligibility for parole based on a particular

23  disability.  Id. at 858 (fn.4).  However, an individualized assessment that an inmate's disability,

24  for example, would endanger the public was not violative of the ADA.  Id.

25           Petitioner presents no claim of a categorical usage of plaintiff's disability, or

26  categorical denials based on  disability in general with respect to ability to work as a parole

requirement.  Thus, the Thompson holding does not apply.  However, going further, individually

assessing a disability on one's propensity to be dangerous is one thing; inserting a work

requirement regardless of disability is another.  Nevertheless, it is clear from reading the entire

transcript of the BPH hearing, that the BPH commissioners did no such thing.  Indeed, it was

*petitioner* who extensively explored the subject and continued his argument that his kidney

problems should make no difference.  See Answer, Exhibit 1, Part 2 at 11 (electronic pagination)

(issue raised by a BPH commissioner to ensure that petitioner was not having difficulty in

participating at the hearing, at 40 (where a commissioner raised the issue only in passing when

referencing petitioner's realistic work plans), at 69 where *petitioner's* attorney questioned

petitioner about his disability, and raised the issue that petitioner might well qualify for disability

payments if released).

> This court's review of the record confirms that the ruling by the state
court accurately reflects the record of the BPH hearing.  To the extent that petitioner seeks relief
based on an alleged violation of a federal court order, petitioner does not provide any basis for a
finding that any such violation occurred.

> *Claim 4*

> Petitioner states that BPH commissioners in 1998, 2001, 2002, 2005, 2007 and
2009, have repeatedly used petitioner's commitment offense as a basis for parole denial and have
now, without supporting judicial authority' reclassified petitioner's non-murder offense[12] as a
murder in violation of his due process and equal protection rights.  Petition, p. 9.  Petitioner
contends that the BPH's use of CAL. CODE REGS. tit.xv, §§ 2281/2[402], the state regulations that
set forth parole consideration criteria for life prisoners.  CAL. CODE REGS. tit.xv, § 2281 specifically
sets forth the "parole consideration criteria and guidelines for life prisoners" and § 2402

---

[12]  Petitioner was convicted of aggravated mayhem (Cal. Penal Code § 205) (setting
another person on fire with a flammable liquid) for which he was sentenced to life with the
possibility of parole.

1   addresses the "parole consideration criteria and guidelines for life prisoners who have been

2   convicted for murders committed on or after November 8, 1978 and for specified attempted

3   murders."  Petitioner maintains that the use of these regulations by the BPH "is an illegal

4   cr[i]teria [sic] for aggravated mayhem only to establish an [on] going abuse of discretion" as well

5   as arbitrariness and capriciousness in the denial of his parole.  Docket # 2, p. 14.

6          Petitioner's concedes that his conviction carries a life sentence but argues that in

7   repeatedly denying him parole he is being punished disproportionately for the lesser offense of

8   aggravated mayhem, whose mininum eligible parole date was in May 4,1999, by standards

9   applied to convicted murderers.  Docket # 2, pp. 13-17; docket # 2-1,  pp. 4-5.[13]  Petitioner cites,

10  inter alia, Irons v. Carey, 358 F. Supp.2d  936, 947 (E.D. Cal. 2005), and Biggs v. Terhune, 334

11  F.3d 910, 916 (9th Cir. 2003) (which, while finding some evidence to support denial of parole,

12  noted that continued denial of a parole date on the basis of petitioner's offense and previous

13  conduct would implicate inmate's liberty interest in parole) in support of his claim.   The writ

14  granted at the district court level in Irons on the ground that there was insufficient evidence to

15  support the 2001 parole denial decision was reversed by the Ninth Circuit in Irons v. Carey, 505

16  F.3d 846 (9th Cir. 2007) (holding that due process in the circumstances was not violated when

17  parole deemed unsuitable prior to expiration of minimum term).  Subsequently, the Ninth Circuit

18  decisions in both Irons and Biggs were overruled by Hayward v. Marshall, 603 F.3d 546 (9th Cir.

19  2010), itself reversed by the decision in Swarthout v. Cooke, 131 S. Ct. 859, 862, finding, as

20  previously set forth, no federal liberty interest in a California inmate's state-created right to

21  parole, and no federal process due beyond the minimal procedures of "an opportunity to be

22  heard" and "a statement of reasons why parole was denied."

23          Thus, once again, beyond determining that petitioner received an opportunity to

24  be heard and a statement of reasons for the denial at his parole hearing, which he did, this court

25

26          [13] Petitioner states his MEPD was May 9, 1999, but the BPH stated it was May 4, 1999.  .
Docket # 2, p. 14; docket # 2-1,  pp. 4-5.

1  cannot review the basis for the state court's determination that "some evidence" supported the

2  parole "board's core finding that petitioner poses a current threat to public safety."  Contra Costa

3  County Superior Court ruling in docket # 16-3,  at p. 7.  Therefore, this claim must be denied to

4  the extent that his contention is that the use of the unchanging facts of his commitment offense as

5  a basis for denying parole violates his constitutional rights.  To the extent that petitioner claims

6  that his offense has been reclassified as a murder offense when he did not commit a murder, that

7  claim is addressed in the discussion of the essentially duplicative Claim 1 below.

8                       State Law Claim - Claim 1

9                Petitioner claims that he has been denied due process and equal protection for the

10  sixth time by the failure of BPH to establish the criteria for aggravated mayhem, Cal. Pen. Code

11  § 1168/203, pursuant to their duty under Cal. Penal Code §§ 3041(A), 3041.5 [6] and because

12  (part of Claim 4) his non-murder offense has been reclassified as murder.

13                The state court ruled as follows on this issue:

14            Petitioner contends that he was considered for parole under a
           murder criteria for a non-murder offense.  On November 13, 2008
15            the Northern District California Court ruled on a writ of habeas
           corpus filed by petitioner challenging an earlier decision of the
16            Board.  The Court dismissed on several grounds but ordered a
           show cause hearing on the issue of whether the Board used the
17            criteria for murder and whether the application of such criteria to a
           prisoner convicted of aggravated mayhem was arbitrary and
18            capricious.  (Ex. A).  This case is presently pending before the
           District Court.[14]

19
           Similarly, during his most recent parole suitability hearing,
20            petitioner objected that the Board was acting arbitrarily and
           capriciously by using the "murder criterion" pursuant to Cal. Cod
21            Regs, Title 15, § 2402. Ex. D, p. 9 (Board Hearing).  Petitioner's

22

23            [14]  A court may take judicial notice of court records.  See Barron v. Reich, 13 F.3d 1370,
      1377 (9th Cir. 1994); MGIC Indem. Co. v. Weisman, 803 F.2d 500, 505 (9th Cir. 1986); United

24      States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980).  This court takes judicial notice of the
      Northern District case the state court has referenced as pending at the time of its decision, Culler

25      v. Board of Parole Hearings, No. C-08-1524 WHA (PR) (N.D. Cal.), and notes that, by order
      filed on September 8, 2009, that case, pursuant to respondent's motion to dismiss, was

26      subsequently dismissed as barred by the AEDPA statute of limitations, and judgment thereon
      entered.

                                    16

attorney explained that it was "a legal objection to the nature of the law." Ex. D, p,9 (Board Hearing).  His counsel represented that the law under which petitioner was convicted was aggravated mayhem.  Ex. D, p. 9-10 (Board Hearing).  Counsel contended that there was a legal question as to whether people convicted of aggravated mayhem should have the same parole rules used against them as convicted murderers.  Ex. D, p. 9-10 (Board Hearing).  According to petitioner's counsel, at the time of the hearing, the issue was "before the court" and petitioner was waiting for a decision. Ex. D, p. 9-10.  The Board overruled petitioner's objection and proceeded with the hearing utilizing Cal. Code Regs., Title 15, § 2402.

The court finds that the Board followed the proper statutory scheme for parole suitability decisions.  The Board was authorized to determine whether petitioner, who had been sentenced to an indeterminate prison term, should be released on parole, in accordance with the provisions of Penal Code § 3041.  Subdivision (b) section 3041 provides in pertinent part: "The panel or the board, sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

In determining whether the public safety requires the prisoner to serve a more lengthy period of incarceration rather than be released on parole, the Board was guided by the criteria listed in the California Code of Regulations.  The Board must deny parole "if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs., tit. 15, §§ 2281 § (a) 2402 § (a).  To assess the risk and thus determine the prisoner's suitability for parole, the Board must consider "[a]ll relevant, reliable information available to the panel." Cal. Code Regs., tit. 15, §§ 2281(b), 2402, (b).

In the present case, petitioner was convicted of aggravated mayhem for which he was sentence to a term of life with the possibility of parole.  The parole suitability criteria applicable to petitioner, a life prisoner, were set forth in Cal. Code Regs., tit. 15, § 2281.  Cal. Code Regs., tit. 15, § 2292(a) further provides that "[a]ll life prisoners committed to state prison for crime(s) committed prior to July 1, 1977 shall be heard in accordance with rules in effect prior to 7/1/77.  All life prisoners heard after the effective date of these regulations, who have been committed to state prison for crime(s) committed after 7/1/77, shall be heard in accordance with this article."  This retroactivity provision was effective on or about June 1979.

Here, the Board cited the parole suitability criteria for inmates

17

convicted of committing murder or attempted murder as set forth in Cal. Code Regs., tit. 15, §§ 2402.  However, because the parole suitability criteria applicable to life prisoners are identical to the parole suitability criteria for murderers, the Board applied the proper criteria to petitioner in determining his suitability for parole. *Board of Prison Terms v. Superior Court* (2005) 130 Cal. App. 4th 1212, 1232, fn.5.

Cal. Code Regs., tit. 15, §§ 2280 provides in part that "[a] life prisoner shall be considered for parole for the first time at the initial parole consideration hearing.  At this hearing, a parole date shall be denied if the prisoner is found to be unsuitable for parole under § 2281 (d)...".  Included in the relevant information that the Board considered in determining petitioner's suitability for parole were circumstances that have been termed "parole suitability factors."  The applicable regulations include the following suitability factors: (1) no juvenile record; (2) a stable social history; (3) signs of remorse; (4) the motivation for the crime was significant life stress; (5) battered woman syndrome; (6) no history of violent crime; (7) age; (8) realistic plans for the future; and (9) institutional behavior.  Cal. Code Regs., tit. 15, §§ 2281, (b), 2402, (b).

The Board also considered "parole unsuitability factors," which were circumstances that "each tend to indicate unsuitability for release."  Cal. Code Regs., tit. 15, §§ 2281(c), 2402(c).  Parole unsuitability factors included: (1) the commitment offense (whether "the prisoner committed the offense in an especially heinous, atrocious or cruel manner"); (2) a previous record of violence; (3) an unstable social history; (4) sadistic sexual offenses; (5) psychological factors; and (6) serious misconduct in prison or jail.  Cal. Code Regs., tit. 15, §§ 2281(c), 2402(c).  The presence of several unsuitability factors may have a cumulative effect, because "[c]ircumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."  Cal. Code Regs., tit. 15, §§ 2281(b), 2402 (b).

Therefore the parole suitability criteria set forth in Cal. Code Regs. title 15, § 2281 are identical to the parole suitability criteria stated in Cal. Code Regs., title 15, § 2402.  Petitioner has failed to demonstrate that the Board considered him for parole under murder criteria for a non-murder offense.  The Board in effect applied the same criteria as if they had relied on Cal. Code Regs., tit. 15, § 2281.

Contra Costa County Superior Court ruling in docket # 16-3, pp. 11-13.

A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d

1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is

unavailable for alleged error in the interpretation or application of state law. Middleton v. Cupp,

768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v.

Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state

issues de novo. Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

      The Supreme Court has reiterated the standards of review for a federal habeas

court. Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991). In Estelle v. McGuire, the

Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had

granted federal habeas relief. The Court held that the Ninth Circuit erred in concluding that the

evidence was incorrectly admitted under state law since, "it is not the province of a federal

habeas court to reexamine state court determinations on state law questions." Id. at 67-68, 112 S.

Ct. at 480. The Court re-emphasized that "federal habeas corpus relief does not lie for error in

state law." Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092,

3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts

may not grant habeas relief where the sole ground presented involves a perceived error of state

law, unless said error is so egregious as to amount to a violation of the Due Process or Equal

Protection clauses of the Fourteenth Amendment).

      The Supreme Court further noted that the standard of review for a federal habeas

court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

the United States (citations omitted)." Id. at 68, 112 S. Ct. at 480. The Court also stated that in

order for error in the state trial proceedings to reach the level of a due process violation, the error

had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have

defined the category of infractions that violate "fundamental fairness" very narrowly.'" Id. at 73,

112 S. Ct. at 482. Habeas review does not lie in a claim that the state court erroneously allowed

or excluded particular evidence according to state evidentiary rules. Jammal v. Van de Kamp,

926 F.2d 918, 919 (9th Cir. 1991). As more recently re-emphasized by the Supreme Court, "'a

1   mere error of state law ... is not a denial of due process.'" <u>Rivera v. Illinois</u>, 556 U.S. 148, 129 S.

2   Ct. 1446, 1454 (2009) (quoting <u>Engle v. Isaac</u>, 456 107, 121, n. 21, 102 S. Ct. 1558 [] (1982)).

3   This claim must be denied.

4                          Ex Post Facto Claim - Claim 5

5              Petitioner protests the seven-year denial as a violation of the Ex Post Facto

6   Clause.  Petition, p. 10.  Specifically, petitioner alleges an ex post facto violation by the

7   application to him of Proposition 9, Marsy's Law,[15] for a deferral of parole consideration for

8   seven years because petitioner was not convicted of murder.  Docket # 2, p. 17.  Petitioner cites

9   <u>Weaver v. Graham</u>, 450 U.S. 24, 29, 101 S. Ct. 960  (1981) for the principle "that two critical

10  elements must be present for a criminal or penal law to be ex post facto: it must be retrospective,

11  that is, it must apply to events occurring before its enactment [] and it must disadvantage the

12  offender affected by it. [Footnotes omitted]."   Petitioner cites, inter alia, a state court case, <u>In re:</u>

13  <u>Bray</u>, 97 Cal. App.3d 506, 517-18 (1979), in which a California appellate court found that an

14  amendment to the Determinate Sentencing Law lengthening the period of parole which took

15  effect while petitioner therein was on parole but prior to his scheduled discharge date violated the

16  ex post facto clause when his discharge date was lengthened pursuant to the amendment.

17  Petition, pp. 17-18.  Respondent, in opposition, cites <u>California Department of Corrections v.</u>

18  <u>Morales</u>, 514 U.S. 499, 115 S. Ct. 1597 (1995), wherein the Supreme Court reasoned that a 1981

19  amendment to California's parole procedures allowing the parole board to decrease the frequency

20  of parole hearings in certain circumstances did not violate the ex post facto clause when applied

21  to prisoners convicted prior to the amendment's enactment.  Answer, pp. 19-21.  In <u>Morales</u>, the

22  high court noted that the 1981 amendment first, only applied to "a class of prisoners for whom

23  the likelihood of release on parole is quite remote"; second, did not affect the date of an initial

24  paroled suitability hearing, only subsequent hearings; finally, the board retained "authority to

25

26          [15] Cal. Penal Code § 3041.5, as amended in 2008 by Proposition 9 (Marsy's Law).

1    tailor the frequency of subsequent suitability hearings to the particular circumstances of the

2    individual prisoner." 115 S. Ct. at 1603-1604.  Thus, the Morales Court found that the subject

3    legislation created "only the most speculative and attenuated risk of increasing the measure of

4    punishment attached to the covered crimes." Id., at 1605.  Respondent maintains therefore that

5    the denial of this claim by the state court was not an unreasonable application of Supreme Court

6    authority.

7           This court, however, will not reach that claim.  Petitioner's claim regarding the

8    application of Proposition 9 resulting in an increased deferral period before his next parole

9    suitability hearing is not a challenge to the parole denial decision itself and is, therefore, not

10   cognizable under 28 U.S.C. § 2254.  Although petitioner's ultimate goal is a speedier release

11   from incarceration, the immediate relief sought on this ground vis-a-vis Marsy's Law is a

12   speedier *opportunity* to *attempt* to convince BPH once again that he should be released; that is

13   too attenuated from any past finding by the BPH of parole suitability for such a claim to sound in

14   habeas.  Rather this claim is a challenge to the constitutionality of state procedures denying

15   parole eligibility or suitability and could properly proceed pursuant to an action under 42 U.S.C.

16   § 1983.  Skinner v. Switzer, ___U.S.___, 2011 WL 767703 at *8 (Mar. 7, 2011) ("Success in his

17   suit for DNA testing would not 'necessarily imply' the invalidity of his conviction"); id., citing

18   Wilkinson v. Dotson, 544 U.S. 74, 82, 125 S. Ct. 1242, 1248 (2005) ("Success...does not mean

19   immediate release from confinement or a shorter stay in prison" but "at most [a] new eligibility

20   review" or "a new parole hearing....").  Moreover, the High Court in Wilkinson expressly noted

21   that a claim seeking "an injunction barring *future* unconstitutional procedures did *not* fall within

22   habeas' exclusive domain." Id. at 81, 125 S.Ct. at 1247 [emphasis in original.]  Even earlier, the

23   Ninth Circuit had found that the challenge of inmates to a sex offender treatment program as a

24   violation of, inter alia, the ex post facto clause and their due process rights was appropriate under

25   § 1983 because victory could only result in "a ticket to get in the door of the parole board....,"

26   and did not undermine the validity of convictions or continued confinement.  Neal v. Shimoda,

1   131 F.3d 818, 824 (9th Cir. 1997).

2            Moreover, currently, there is a class action proceeding, Gilman v. Brown, CIV-S-

3   05-0830 LKK GGH,[16] wherein "the procedures used in determining suitability for parole: the

4   factors considered, the explanations given, and the frequency of the hearings" are what is at

5   issue.   Id., p. 8 [emphasis in original].  The "frequency of the hearings" is precisely what is at

6   issue in the instant claim.

7            The Gilman class is made up of:

8            California state prisoners who: "(I) have been sentenced to a term
             that includes life; (ii) are serving sentences that include the
9            possibility of parole; (iii) are eligible for parole; and (iv) have been
             denied parole on one or more occasions."

10

11  Id., p. 10.[17]

12           Petitioner, sentenced to a term of life with the possibility of parole for aggravated

13  mayhem with use of a deadly weapon, challenging a sixth subsequent parole consideration

14  hearing denial, fits squarely within the parameters of the Gilman class.[18]  Petition, pp. 1, 8;

15  Answer, p. 1 & Dkt. # 12-1, p. 39.  This claim should be denied without prejudice and the entire

16  petition denied.

17  \\\\\

18  \\\\\

19

20      [16] See Docket # 182 of Case No. 05-CV-0830.

21      [17] The Ninth Circuit affirmed the Order, certifying the class.  See Docket # 258 in Case
    No. 05-CV-0830.
22

23      [18] As a member plaintiff of a class action for equitable relief from prison conditions,
    petitioner may not, as plaintiff, maintain a separate, individual suit for equitable relief involving
24  the same subject matter of the class action.  See Crawford v. Bell, 599 F.2d 890, 892-93 (9th
    Cir.1979); see also McNeil v. Guthrie, 945 F.2d 1163,1165 (10th Cir. 1991) ("Individual suits for
25  injunctive and equitable relief from alleged unconstitutional prison conditions cannot be brought
    where there is an existing class action ."); Gillespie v. Crawford, 858 F.2d 1101, 1103 (5th
26  Cir.1988) (en banc) ("To allow individual suits would interfere with the orderly administration of
    the class action and risk inconsistent adjudications.").

1    Accordingly, IT IS HEREBY RECOMMENDED that the petition be denied.

2    If petitioner files objections, he shall also address if a certificate of appealability

3 should issue and, if so, as to which issues.  A certificate of appealability may issue under 28

4 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a

5 constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate of appealability must "indicate

6 which specific issue or issues satisfy" the requirement.  28 U.S.C. § 2253(c)(3).

7    These findings and recommendations are submitted to the United States District

8 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

9 days after being served with these findings and recommendations, any party may file written

10 objections with the court and serve a copy on all parties.  Such a document should be captioned

11 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

12 shall be served and filed within fourteen days after service of the objections.  The parties are

13 DATED: April 16, 2012

14                                             /s/ Gregory G. Hollows
                                        UNITED STATES MAGISTRATE JUDGE

15

16 GGH:009

17 cull0912.prl

18

19

20

21

22

23

24

25

26

23